In his elaborate argument, the defendant's counsel insists, as his first ground of appeal, that the preliminary proofs were deficient, in that they did not contain the affidavit or certificate of Doctor Bartlett as one of the attending physicians. Although he had been a practicing physician, Doctor Bartlett was not such at the time of the death of Gibson, and had not been for some years previously. He was one of the sympathizing friends, who, on occasions of accident or death, are present to give aid and comfort. Mrs. Gibson immediately, on the arrival of her husband, dispatched a messenger for Doctor Meachem, the family physician. *Page 582 
In the mean time, the wounded man being in great pain, some person suggested that Doctor Bartlett had better make an examination of his wounds. Mrs. Gibson assenting, he did so, and he also gave him morphine to relieve his pain. Upon the arrival of Doctor Meachem, he took charge of the case. It does not appear that Doctor Bartlett acted in any other than a friendly capacity, or that he has at any time desired or expected compensation for his services. I do not know that he could claim compensation in money for his kind offices, any more than could the other neighbors present and assisting. The service was charitable and voluntary. The defendant did not make any request that this question should be submitted to the jury, but claimed, as a matter of law, that Doctor Bartlett was an attending physician. This claim cannot be sustained.
The question in contention at the circuit was, whether the death of the deceased was accidental, or whether it was a case of intentional self-destruction. To aid in elucidating this inquiry, the defendant insisted that he had the right to show that the deceased was an infidel, and an atheist, and thence to draw an argument in support of the theory of intentional suicide. The defendant insists upon the competency of this evidence upon the further ground, that every man is presumed to be a Christian; that the Christian religion prohibits self-slaughter; that this presumption of Christianity and its influence might operate upon the minds of the jury, and should be allowed to be overthrown by the testimony offered.
It is not necessary to say how far, or how precisely, the presumption of personal Christianity exists. That we live in a Christian country is certainly true. It is acknowledged by the laws of the land, which prohibit blasphemy and profanity, and enjoin the observance of Sunday. That we believe in a governing Providence, by whom crime will be punished and virtue rewarded, is assumed in every oath that is administered. To say, however, that every man is presumed to be a personal Christian, upon whose mind and upon whose actions the precepts of the Gospel exercise an influence, is so *Page 583 
much against our common experience, that it cannot be assumed as a legal principle. It may be argued, however, that a man may hold this belief, although his actions be not at all times influenced by it. This is probably true, and here arises the difficulty in the admission of the evidence offered.
Consider the great variety of creeds held by those calling themselves Christians. We find not only the Roman Catholic, the Episcopalian, the Presbyterian, the Methodist and Baptist, but a large class who believe in the punishment of in this world only, and the ultimate salvation of the whole human race. These are all Christians. They all acknowledge the inspiration of the Holy Scriptures, and the obligation of its commands. In what way, and how far do these systems of belief operate upon the conduct of man? Is it certain that he who believes in the eternal punishment of the impenitent, in a future world, is a better observer of the laws of his country, and more free from actual crime, than he who denies that doctrine? Or is it certain that he who believes in the final salvation of all men, would refrain from an offense which he would have committed, had he believed that there was no future state? No man can answer with certainty. Does the fact that a man believes in the Christian religion, furnish legal evidence, that in a particular case he has not violated the laws of God or of his country? Experience teaches us that not only believers in the Christian religion, but those who for years have given the highest evidence that they would receive the ultimate reward of the true Christian, are guilty of grave offenses, moral and legal. The law takes man as he is, with his passions, his appetites, his infirmities, and with his education, his moral training, and his religion. With all these elements, his life is a struggle, and a contradiction. What his actions will be, can be determined by no form of belief, and by no fixed principle of law. Each man's case will be different from that of his neighbor, and from day to day will be different from his own. *Page 584 
The "infidel" is one who does not recognize the inspiration or obligation of the Holy Scriptures, or the generally recognized features of the Christian religion. The "atheist" is one who does not believe in the existence of a God. The result of this absence of belief upon his actions is speculative entirely. Does his soul shrink back at the idea of annihilation? We know not. He may not admit the existence of a soul; and the eternal rest of the grave may form his idea of paradise. On the one side would stand the idea of annihilation, and on the other that of an offended God. Who can say, as matter of fact, which would produce the strongest effect on the human mind? Is there any feeling or principle stronger than that instinctive dread of death, which all men feel, and which neither the faith of the Christian nor the reasoning of the atheist can overcome? It does not depend upon life or faith. It is instinctive, and common to all men.
It would, in my judgment, be incompetent to impeach one's conduct, and to adjudge new motives and principles upon the proposed idea. To adjudge that a man's belief in Christianity will prevent, or tend to prevent, the commission of suicide, or that atheism will produce, or tend to produce, a contrary effect, is to adopt a principle more subtle and speculative, more uncertain and more remote, than the law can recognize. If a sound argument, it would be applicable to some extent in every case where character was involved. Would it be a just ground of impeachment of the good character of a party to an action, that he is an infidel or an atheist? If Gibson had been the plaintiff in an action of slander, could his opponent have reduced his damages by showing his belief in these respects? If he had been indicted for murder, and the question of character had been introduced into the issue, could the prosecution have attacked him by showing his skepticism? Or could he have sustained his character by proof that he held a religious belief? Such a suggestion finds no countenance in the authorities. Conduct and life, as distinguished from belief, give the standard of character. In law, it would be a totally immaterial circumstance. *Page 585 
It affords no certain or practical test of conduct. The offer in the present case is based upon the same idea, and the argument in its defense, although plausible and attractive, cannot be sustained.
Judgment should be affirmed, with costs.
All the judges concurring,
Judgment affirmed. *Page 586