# Cases

# FOURTH DEPARTMENT

AT

# GENERAL TERM,

## June, 1875.

---

WILLIAM F. EDINGTON, Plaintiff, v. THE MUTUAL LIFE INSURANCE COMPANY OF NEW YORK, Defendant.

*Policy of insurance — medical attendant — 2 R. S., 406, § 73 — Nonsuit — error in refusing, cured by defendant's proof — Evidence — personal privilege — acts and declarations of insured before issuing of policy.*

A physician who merely makes a casual prescription for a friend when meeting him in the street, cannot be called a medical attendant, who is properly a person to whom the care of a sick person has been intrusted.

In an action brought to recover upon a policy of insurance, the insurance company offered to prove, by physicians, that the assured was affected with numerous diseases, from knowledge thereof which they had obtained by their attendance on him as physicians, and not from any information received from him. The evidence was excluded. *Held* (1), that the objection that the evidence was admissible because it did not appear that the information excluded was necessary to enable the physicians to prescribe, not having been made at the trial, would not be entertained on appeal; (2), that the objection that the statute (2 R. S., 406, § 73) did not prohibit the disclosure of knowledge acquired otherwise than by communications made by the patient, was not well taken, as the word information comprehends the knowledge which the physicians acquire in any way while attending the patient, whether by their own insight, or from statements made by the patient or others, given to the physician in aid of his duty.

An error in refusing a nonsuit is cured by the defendant's supplying the evidence needed.

The statute (2 R. S., 406, § 73) does not apply only to the medical attendant or family physician, but embraces a physician who casually or otherwise attends or prescribes for the patient.

This statute was not repealed by the Code, section 390.

The privilege of objecting to such disclosure was not waived by the party's refering to the physician in the answers to the questions contained in his application for insurance: 1st. Such reference was made simply that the statements of the assured might be verified by inquiries to be made of the physician, and not for the purpose of having him examined as a witness. 2d. One cannot waive a right which, from its nature, must belong to another, and which, in the usual course of things, can never be claimed by himself, because it is brought into existence by his death.

The acts and declarations of an assured, before his insurance was effected, are not admissible as evidence in an action brought by the beneficiary named in a policy of insurance.

MOTION for a new trial by defendant, on exceptions taken at the Circuit and ordered to be heard in the first instance at the General Term.

This action was brought to recover the amount of four policies of insurance, issued by the defendant upon the life of William F. Diefendorf, for his benefit, and held by him up to the time of his assignment thereof to the plaintiff by virtue of an assignment bearing date November 4th, 1869. The assured died on the 21st day of March, 1871.

Each application contained a declaration that it was thereby mutually agreed, by and between the assured and the company, that the particulars contained therein, being the answers of the assured to the questions proposed, formed a part of the contract with the company. And each application also contained an express stipulation and agreement that the said application and the declaration thereto attached, should form the basis of the contract between the assured and the said company.

In each of said applications the assured was asked : " How long since you were attended by a physician, and for what diseases ? Give name and residence of such physician, and the name and residence of your usual medical attendant." To this question, in the first application, he answered : " Dr. Carpenter has known me two years."

In the second application he answered this question in the same way, and in the third application he answered it as follows:

" Have none ; only consulted Dr. C. H. Carpenter, now and then, for slight ailments, and taken his prescriptions.   C. H. Carpenter, Geneva, has known me three years."   The court excluded certain evidence offered on the part of the defendant, which it proposed to give by calling as witnesses physicians who had attended the assured in his lifetime.   The court also allowed, under objection by the defendant, the policies of insurance to be given in evidence by plaintiff, without the applications upon which they were issued.   The judge at Circuit directed a verdict for the plaintiff, and directed the exceptions to be heard in the first instance at the General Term.

*Henry E. Davies, E. G. Lapham, Henry R. Selden, John Gillette, Jr.,* for the defendant.   The learned judge at the Circuit erred in overruling the objection of the defendant that the applications for these several policies were part and parcel of the policies, and that it was not competent for the plaintiff to give in evidence the said policies, without putting in, also, the applications upon which the same were based, and which, by agreement of the parties, formed a part of the contract.   It would seem clear that where part of an instrument, account or letter is offered in evidence, the opposing party is entitled to have the whole introduced.   (Phillips on Evidence [2d ed.], 451 ; per HARRIS, J., *Larue* v. *Rowland,* 7 Barb., 112 ; see, also, *Rawls* v. *Am. Life Ins. Co.,* 36 Barb., 365 ; S. C., 27 N. Y., 293, 294.)   An application signed by the insured is to be deemed a part of the contract of insurance, when it is expressly referred to in the policy as forming a part thereof.   (*Murdock* v. *Chenango Mut. Ins. Co.,* 2 N. Y., 210 ; Bliss on Life Ins. [2d ed.], 91 ; *Lycoming Fire Ins. Co.* v. *Sailer,* 67 Penn., 108 ; *Dullard* v. *Am. Pop. Life Ins. Co.,* Supr. Ct., Buffalo.)   The court erred in excluding the question put to Dr. Eastman, viz. :  For what diseases did you treat Diefendorf ?   He was asked to state what he knew independent of any information he gave the witness, or of anything Diefendorf said.   The statute, by virtue of which this exclusion is sought to be maintained, only prohibits the disclosure of "any information which he may have acquired in attending any patient in a professional character, and which information was necessary to ·enable him to prescribe for such patient as a physician."   (2 R. S. [Edm. ed.], 422 ; *The People* v. *Gates,* 13 Wend., 324 ; *Kendall*

v. *Grey,* 2 Hilt., 300; *Dutchess of Kingston Case,* 11 How. State Trials, 243; S. C., 12 id., 643; 1 Greenl., § 248; 2 R. S., 406, § 73; *Hewett* v. *Prime,* 21 Wend., 79.) The privilege being personal, the decease of the party entitled to avail himself of it, puts it beyond possibility to assert the privilege. (*Allen* v. *The Public Administrator,* 1 Brad., 221; affirmed, *sub nom. Thayer* v. *Allen,* Selden's Notes, 57, April, 1853; 1 Abbott's Digest, 22; *Johnson* v. *Johnson,* 14 Wend., 637; 1 Greenl. on Ev., note, 281; Bliss on Life Ins. [2d ed.], 648; *Dillaber* v. *Home Life Ins. Co.,* N.Y. S. C., Judge VAN VORST, Ins. Law Jour., Aug., 1874, p. 638.) By section 390 of the Code, a party may now examine the adverse party as a witness, in the same manner as other witnesses may be examined. It would, therefore, have been competent, if the applicant had been living, to have examined him as a witness with reference to his having had the diseases inquired of, or as to the state of his system or his organs. (*Whitney* v. *Barney,* 30 N. Y., 342; 12 Abb. Pr., 249, DALY, Ch. J., 262; *Coutail* v. *Thomas,* 9 Barn. & Cress., 288; *In re Bellis et al.,* 38 How. Pr., 79.) There was concealment of what good faith and the contract between the parties required to be disclosed, in reference to matters inquired of, and those not asked about. (*Baker* v. *Home Life Ins. Co.,* 4 N. Y. S. C., 582.)

*George F. Danforth,* for the plaintiff. The statements of the assignor could not affect the assignee. (*Paige* v. *Cagwin,* 7 Hill, 361; *Booth* v. *Swezy,* 8 N. Y., 279.) And the rule is not changed because the declaration is made by a person about to be insured. (*Westropp* v. *Bruce,* 3 L. and A. Ins. Rep., 288; *Rawle* v. *Am. M. L. Ins. Co.,* 27 N. Y., 282.) The words of the statute applied to physicians are imperative. No person shall be allowed to disclose. (2 R. S., 442, § 73; *Johnson* v. *Johnson,* 4 Paige, 467; S. C. in error, 14 Wend., 641; 1 Greenl., § 243.) The fact (if it is so) that the patient, if alive, could be required to testify as to the matters inquired of, will not render the physician competent. (*Brand* v. *Brand,* 39 How. Pr., 193; *Rogers* v. *Lyon,* 64 Barb., 373; see revisers' notes, 3 R. S. [2d ed.], 737.)

GILBERT, J. :

We are called upon to consider only the exceptions taken upon the trial. Nothing else is before us. That the answers of the

assured to the questions put to him on his applications, of which
the defendants complain, were warranties, admits of no question.
It is equally clear that a breach of warranty avoids a policy of
insurance, whether the untrue statement was made upon the
knowledge of the assured, or in good or bad faith, or was actually
injurious to the insurer. The rule of law on this subject, as applied
to contracts of insurance, is too well settled to require argument
or authority to support it. This rule, however, is not directly
involved in the case before us; for, in none of the rulings to which
the exceptions relate, was it questioned that the statements of the
assured, referred to, were warranties. The refusal of the judge to
dismiss the complaint, or to submit the case to the jury, rests upon
the ground that no breach of warranty had been proved. The
legal effect of the answers given by the assured to the interroga-
tories put to him, was not disputed. The principal point to be
determined, therefore, is whether either of the answers, of which
the defendant complains, were untrue in point of fact. We are of
opinion that the evidence does not warrant that conclusion. It
appears that the same question was put to the assured on each
application, namely: "How long since you were attended by a
physician? For what diseases? Give name and residence of such
physician, name and residence of your usual medical atttendant?"
The answer given on the first and second application was the same,
namely: "Dr. Carpenter has known me two years." That given
on the third and last application was: "Have none.; only consulted
Dr. C. H. Carpenter now and then for slight ailments, and taken
his prescriptions. C. H. Carpenter, Geneva, has known me three
years." It appears that the assured consulted Dr. Eastman pro-
fessionally, and the latter made prescriptions for him in 1863. Mr.
Proudfit, who had been a partner of the assured from July, 1866,
to April, 1868, testified that Dr. C. H. Carpenter and M. N. Picot
attended the assured professionally during that period. Dr. Car-
penter testified that he treated him in 1866 and in 1870, but could
not state that he treated him in 1868, although he had before testi-
fied that he had given him some prescriptions in 1868. Dr. Picot
testified that he attended him as a physician first in January, 1868;
that he merely gave him a prescription to be used at that time, but
did not attend him in sickness; that he gave him prescriptions,

once in a while, for two years and a half afterwards. On cross-examination this witness testified that the assured was always about, attending to his regular business, when he attended him; that his prescriptions were a month or two apart, and were every time given upon the street. The answers given on the first and second application were neither true nor false, for they were not at all responsive to the questions put. Nor can the assured be charged with having suppressed the information which the interrogatories were designed to elicit. The company received the answers given without objection, and thereby waived the giving of fuller ones. If the answers were not satisfactory, they should have so informed the assured. Not having done so, it will be presumed that the answers gave them all the information needed. (*Rawls* v. *Am. Mut. L. Ins. Co.*, 27 N. Y., 283.) The facts stated in them are true, and the omission to give all the information which full answers would have afforded, cannot be imputed as a breach of warranty, or as a fraudulent suppression of the truth.

With respect to the other answers, it is contended that the statement that the assured had no medical attendant was untrue, because Drs. Eastman and Avery attended him previous to 1866, Dr. Carpenter in 1866 and 1867, and Dr. Picot during the years 1867 and 1868. There is no evidence that either Dr. Eastman or Dr. Avery was his usual medical attendant at the time to which the inquiry related. On the contrary, Dr. Eastman testified that the assured passed out of his hands in 1863, and Dr. Avery testified that his treatment occurred in 1864 or 1866, consisted of the preparation of medicines, and lasted only a week or ten days. The circumstances under which Drs. Carpenter and Picot prescribed for him, have been already mentioned. The statement of Mr. Proudfit that Drs. Carpenter and Picot attended him, must be taken as having reference to the acts testified to by them. Setting aside Dr. Eastman, we think it would be a perversion of the real relation which existed between these physicians and the assured, to call either of them his medical attendant. A medical attendant is one to whom the care of a sick person has been intrusted. A physician who merely makes a casual prescription for a friend, under the circumstances proved in this case, in the street or elsewhere, can hardly be called such. (*Gibson* v. *Am. Mut. Life Ins. Co.*, 37 N.

Y., 580.) We are of opinion, therefore, that the learned judge did not err in refusing the requests referred to, or in directing a verdict for the plaintiff.

The admission in evidence of the policies, without the applications, was not, we think, improper. The policies of themselves formed complete contracts on the part of the defendant, and the warranties and representations contained in the applications, though forming the consideration of the contracts, were independent and collateral engagements, the breach of which constituted a defense, and which, without proof of such breach, were wholly inoperative upon any rights of the plaintiff. But even if the objection of the defendant on this point should be deemed a good one, it was obviated by the subsequent introduction of the applications by the defendant itself. Even an error in refusing a nonsuit is cured by the defendant's supplying the evidence needed.

The remaining questions are these : First, whether the acts and declarations of the assured, before his insurances were effected, were admissible in evidence ; second, whether the physicians who had prescribed for the assured should have been permitted to disclose information which they had thereby acquired.

The first of these questions has been conclusively settled in this State adversely to the defendant, and it cannot now be treated as an open one. (*Rawls* v. *Am. Mut. Life Ins. Co., supra* ; *Swift* v. *Mass. Mut. Life Ins. Co.,* 2 N. Y. S. C., 303 ; Bliss L. Ins., § 362.) The admissibility of acts and declarations of assignors, in cases where fraud committed by them and their confederates is the subject in controversy, rests on a different principle. Such declarations are admitted as part of the *res gestœ.* But the acts and declarations offered in this case related to another transaction between the declarant and another party, and had no connection with the transaction in controversy here.

We are also of opinion that the testimony of the physicians was properly excluded. The statute provides that "no person authorized to practice physic or surgery, shall be allowed to disclose any information which he may have acquired in attending any patient in a professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or to do any act for him as a surgeon." (2 R. S., 406, § 73.) The offer was, to

prove by the physicians named that the assured was afflicted with numerous diseases, from knowledge thereof which they obtained by their attendance on him as physicians, and not from any information received from him. The plaintiff's counsel objected to the offer, on the ground that the evidence offered was privileged from disclosure by the statute cited, and the offer was rejected on that ground alone. It is now urged that the evidence offered was admissible because it did not appear that the information excluded was necessary to enable the physicians to prescribe. That suggestion was not made at the trial. If it had been, it might have been obviated. For this reason it cannot be considered on appeal. It is also urged that the statute does not prohibit the disclosure of the knowledge which the physicians acquired otherwise than by communications made by the patient. We think such a construction would be too narrow. The word "information," as used in the statute, comprehends the knowledge which the physicians acquired in any way while attending the patient, whether by their own insight, or by verbal statements from him, or from members of his household, or from nurses or strangers, given in aid of the physician in the performance of his duty. Such is the true signification of the word "information." Knowledge, however communicated, is information. It may be as well derived through the sense of sight as that of hearing. The principle is the same in whatever way the information passes. (*Coveney* v. *Tannahill*, 1 Hill, 35; *Robson* v. *Kemp*, 5 Esp., 53.) A dumb patient and one whose vocal organs have been paralyzed, are equally protected by the statute with others. The secrets of the sick chamber cannot be revealed, because the patient was too sick to talk, or was temporarily deprived of his faculties by delirium or fever, or any other disease, or because the physician asked no questions. The statute seals the lips of the physician against divulging in a court of justice the intelligence — or, if the word is preferred, the knowledge or information — which he acquired while in the necessary discharge of his professional duty. It was enacted for the purpose of extending to the relation between a patient and his physician, the same rule of public policy by means of which the common law protected the professional confidence necessarily existing between a client and his attorney. We

deem it a wise and salutary enactment, notwithstanding the principle of affording the protection of the law to professional confidence has in recent times met with strong opposition, supported by able arguments. (See Rules of Evidence, by Mr. J. Appleton of Maine.) It was intended to remove from the law a reproach which had been long felt and often expressed by judges, and it should be interpreted and enforced in a liberal spirit, with a view to effectuate its purpose. (*People* v. *Stout*, 3 Park. Cr., 670.)

Again, it is said that the privilege of objecting to the disclosure is that of the party, and that the assured, by referring the defendants to Dr. Carpenter when answering the questions put to him on his applications respecting his medical attendant, waived the privilege. There are several answers to this : First. The reference to Dr. Carpenter is easily explained by saying that it was given to enable the defendants to verify the statements of the assured by inquiries to be made of the doctor, who was one of the defendant's medical examiners, out of court, rather than by an examination of him as a witness. Second. No occasion for the exercise of the privilege would ordinarily arise until after the death of the assured. One cannot waive a right, which, from its nature, must belong to another, and which, in the usual course of things, can never be claimed by himself, because it is brought into existence by his death. It is quite correct to say that the privilege is that of the party. The meaning of this, however, is, that the physician will not be allowed to break the seal of confidence, of his own volition. He must at least have the consent of his patient before he can do it. We are of opinion, also, that when the patient has died without giving such consent, the statute forbids his testimony being received if objected to by the " party " whose interests are to be affected by it. In such a case, if the rule mentioned be applicable at all, the term " party " must have reference, not to the dead patient, but to the living litigant, against whom the objectionable testimony is offered on the trial of an action to which he is a party. It would be unreasonable to suppose that it was the intention of the legislature, that the protection afforded by the statute should wholly cease with the death of the patient. Such a construction of the statute would impair and in many cases, frustrate the principle on which it is founded, namely, the promotion of unrestrained confidence between physi-

cian and patient, and the removal of all temptation to concealment by the latter, which, without that confidence, might operate on his mind.   For it hardly need be observed, that most men are quite as solicitous respecting posthumous, as they are concerning living reputation.   In *Wilson* v. *Rastall* (4 T. R., 760), BULLER, J., expressed the opinion, that an attorney who was privileged, so as not to be examined in any action against his client, could not prove the same facts in any action *against any other person*.  (See, also, *Rex* v. *Withers*, 2 Camp., 578.)   Professor Greenleaf lays down the rule applicable to such cases, thus :  " The protection given by the law to such communications, does not cease with the termination of the suit or other litigation or business, nor by any other change of relations between attorney and client, *nor by the death of the client.*" (1 Greenl. Ev., § 243.)   This is the logical consequence of requiring the consent of the client or patient before the attorney or physician will be permitted to disclose professional secrets, for it is impossible to conceive any principle whereby death, which forever precludes the power of giving consent, might be deemed an equivalent thereof.   The most that can be reasonably claimed, is, that by the death of the client or patient, the power of giving the requisite consent devolves upon the successor in interest of the deceased, with regard to the subject-matter involved, and perhaps the statute does not warrant that concession.   We express no opinion on the subject.

The argument, that, by allowing the privilege under consideration, the court will promote a scheme of fraud, cannot be admitted. One reason is, that if any such scheme was devised, Dr. Carpenter, the defendant's own medical examiner, must have been a party to it, and it would be more reasonable to presume that the scheme originated with him than with the assured.   Where a medical examiner, selected by the insurer, gives a certificate that an applicant is a fit subject of insurance, when he knows that he is afflicted with diseases which render him unfit, and the insurer acts upon that certificate without further inquiry, and makes the insurance, the conclusion that the transaction, unexplained, was a device of the insurer to cheat the assured, would be quite as fair and legitimate as that it was the act of the assured alone.   Another and decisive reason is, that the statute contains no exception, and we

have no power to interpolate one into it. In *Bank* v. *Mersereau* (3 Barb. Ch., 600), Chancellor WALWORTH rejected a similar argument in favor of admitting the testimony of an attorney, on the ground that it was contrary to the rule of law on that subject. That decision was unquestionably correct, for a rule of the common law, coeval with the existence of the State, can be rightfully changed only by the legislature. The courts overstep their province when they attempt to do so, and it would be a far greater breach of duty to frustrate or impair the operation of a statute, because they deemed it too comprehensive in its scope, or liable to be perverted to improper purposes. The only legitimate remedy for such abuses must be sought in an amendment of the law by the legislature. It is proper to say in this connection, that it is hardly probable that the physicians in this case were privy to any fraudulent design of the assured, or that any such design existed. None of them, except Dr. Carpenter, appears to have had any knowledge of the insurances made by the defendant, and nothing appears to implicate the latter.

Nor can we accede to the proposition that section 390 of the Code, whereby a party to an action is enabled to examine the adverse party as a witness, has abrogated the privilege by which the provision of the Revised Statutes, cited, has protected the information of the physicians against disclosure. Both statutes are perfectly consistent with each other, and, upon a settled principle of law, each is preserved and must be enforced. The authorities to which we have been referred upon this subject, relate only to the effect of section 390 of the Code upon the rule which prevents attorneys and counselors from divulging information in regard to their clients, of a confidential character. It is unnecessary to express any opinion respecting these decisions, for the reason that they do not absolutely conflict with the views expressed. It does not follow that, because section 390 of the Code has abrogated the rule of the common law relative to attorneys, etc., referred to, it has repealed a positive statute which established the same rule with respect to physicians. Besides, the reasons given to support those decisions, however cogent when the client is alive and capable of testifying, cease when he dies.

The prevention and detection of fraud, and the discovery, vindica-

tion and establishment of truth, no doubt are among the chief purposes for the existence of courts of justice. Still, even those great objects cannot be usefully pursued unfairly, or by discreditable means. The meanness and the mischief of prying into a man's confidential consultations with his physician, the general evil of infusing reserve and dissimulation, suspicion and fear, into those communications, are too great to be encountered for the sake of the good which might escape, if the barriers of professional confidence should be pulled down. (See *Pearse* v. *Pearse*, 1 De Gex & Smale, 12.)

It might have been urged with some show of reason, but was not, that, inasmuch as neither of the physicians, except Dr. Eastman, was a medical attendant, they did not come within the purview of the statute. We think, however, that the language of the statute, as well as the policy and intent thereof, plainly embrace a physician who casually, or in any way, attends and prescribes for a patient, whether he be the family physician, or the usual medical attendant, or not. (*People* v. *Stout, supra.*)

Our conclusion upon the whole case is, that the exceptions must be overruled, and that judgment must be ordered for the plaintiff upon the verdict.

Present — MULLIN, P. J., SMITH and GILBERT, JJ.

New trial denied, and judgment ordered for plaintiff on the verdict.